123051, Scott Hubbell v. Certified Inquilation Counsel, you may proceed. Good morning, Justices. My name is Dan Collins on behalf of the Petitioner, Plaintiff Scott Hubbell. Counsel, may it please the Court, I acknowledge at the outset that the standard in this case is the manifest weight of the evidence. And I understand that can be a very difficult one to overcome. I say that I accept that standard and I think that we'll surpass it this morning. Now, if the Commission had simply stated that my client had done an inadequate job search, there would be no appeal because of that standard that exists. But in this case, the Commission, and to their credit, listed five factors upon which they based their decision. I don't think that either singularly nor collectively any one of those five factors supports the Commission's decision. And that's why I think it's against the manifest weight of the evidence. They list the economy as a significant factor for them. My research does not show the Appellate Court or the Supreme Court ever giving consideration to the state of the economy when trying to determine somebody's employability in a stable labor market in terms of an odd lot permanent total disability. Who hired Belmonte? Our firm hired Belmonte. Okay. He opined in conclusion the claimant was prospectively employable and considered him a viable rehabilitation candidate. So does he really help you on a matter of the whole? An excellent point. The fact of the matter is Mr. Belmonte was consulted on two separate occasions. And actually, I think that first report actually strengthens our position. Because the first report that Mr. Belmonte prepared back in July 13, 2009, talked about the fact that there was definitely exposure for a total disability, but there was still possible things that could occur, that could happen to help my client in his job search to make him a better candidate to try and find employment. So he made definite recommendations that were forwarded to the insurance company. Those were not necessarily followed up. And those recommendations are kind of common sense things. Let's work on this gentleman's typing skills. Let's do some practice interviewing, some mock interviewing. Let's work on cold calling. Some of the basic fundamentals of trying to find employment. My client then continues working with the vocational counselors hired by the insurance company for over an additional year, complying with everything that they're asking. At that point, we bring Mr. Belmonte back on February 11, 2011, and ask him to review the additional work that's been done in this case. What Mr. Belmonte notes is the vocational people hired by the insurance company did no further follow-up. They didn't try and assist my client at all. They didn't try and give him any additional skills. At that point, Mr. Belmonte sat back and said, total disability has been realized. There's been no further assistance to this client, and I have the further evidence of an additional year-plus job search that's taken place here without any type of results. As I was saying, the economy should not be a factor. It calls for rank speculation. What's a good economy? What's a bad economy? How long are we supposed to wait? How long should an insurance company have to continue to pay maintenance benefits while we're going through this stuff? Let me ask you a point of question. The medical evidence shows, correct, the claimant was released to work with only limited restrictions on heavy lifting, correct? Yes, permanent restrictions, correct. Okay. But he was released to go back to work? Correct. Okay. The survey reports show a variety of positions that would be suitable for him, customer service, security, labor permissions. Belmonte's report says that he is employed. So why is this a man-in-the-hole? I mean, give us the specific reasons why it's a man-in-the-hole in light of those findings. Why it is a man-in-the-hole? Why it is, yeah, in light of all the contradictory evidence that I just cited to you. I'm a little confused. I would never say that it is a man-in-the-hole case. I would say that my client has an odd-lot permanent total disability. Well, permanent total, okay. Why is it a permanent total in the face of that conflicting evidence? Well, because this is not employable in any labor market? Is that what your position is? Absolutely. Because under the case law, there's two ways of proving an odd-lot permanent total disability. The first case would be to look at the person's age, their circumstances, their background, everything like that. And that's what the vast majority of cases have dealt with. The second case or the second scenario would be to conduct a diligent but failing job search. My client conducted a job search under the respectful guidance of over nine vocational counselors hired by the insurance company, submitted over 2,400 job leads, was able to find but one job interview which did not lead to a job. I would submit that a four-year and seven-month job search with those kind of numbers definitely constitute a failed and diligent job search. I think that's as clear and succinct of a point as I can make on behalf of Mr. Hubbell in this case. The reality is there are rules that have been established to prove an odd-lot permanent total disability, rules that work with our Workers' Compensation Act. If he has permanent restrictions and no one's disputing that he does, and he can't return to his employer, and again, there's no dispute really that he can't. Your client, one of the reasons why your client can get a job is he had a rather peculiar appearance, didn't he? I would say his appearance was no different at the time of his job search than the time that he was hired. I know that people like... He had a beard down to the center of his chest, and he wore his hair shoulder-length and tied it up in a ponytail when he went for a job interview. That's a really impressive bank if you wanted a job as a teller, wouldn't it? Well, I would submit that one of the most successful TV shows out there right now is Duck Dynasty. And it seems to me those... He should have applied for a job at Duck Dynasty because he looked evidently exactly like him. Is this in the record? Yes, it's in the record. Or maybe ZZ Top. He just went to the wrong place. Well, Your Honor, what I would say to that is, or what I would counter partly, is remember that part of the commission's emphasis in denying my client was the fact that he didn't follow up in the auto industry. Now, the commission would say that he never did, and as my brief had pointed out, that's simply inaccurate. He did. The vocational counselors actually tailor-made his resume to go into that. You want to ignore the fact that no normal employer would hire somebody that looks like this if they have to deal with the public, would you? You don't want to talk about that. Well, no, I'll make two valid points about this. The first fact is that when you go into the auto industry, one of the colloquialisms is a grease monkey. These are not gentlemen that are dressed in suits and ties that have their hair, you know, perfectly coiffed. So they're emphasizing, one of the things the commission emphasized was that he should have been more in the auto industry. Well, what's the physical appearance requirement for that? The second point I would make, the second point I would make is this. Through 2,400 contacts that my client made, there was but only one job interview, just one. So the question is, if I'm simply putting a resume in the mail and mailing off, if I'm faxing that resume to a potential employer, if I'm submitting those online, how is it that any one of these people know what my client looks like? It's a very convenient argument to say that my client looks poorly. Well, what were those jobs for that he submitted these 2,400? Anything and everything that between himself and the vocational counselors hired by the insurance company provided for him. These job leads in large part were, in fact, provided by the vocational counselors. He couldn't get a security job because he refused to apply for a PERC card. Why did he do that? I don't think there was any testimony that said that he refused to apply for a PERC card. The fact of the matter is he does not have a PERC card. He did not, I'm not even sure that there was a demand put on him to get a PERC card. Certainly it's a requirement for a security position. The fact of the matter is the insurance, he requested the reimbursement. My reading of the record indicates that he decided not to obtain a PERC card because they wouldn't pay for it. I wouldn't submit that as a flat refusal to get one. I think if you said to somebody... I would get one if you don't pay for it. Well, again, one of my big arguments in this case is this is a necessity that the insurance company should be paying for that PERC card. If they think that there are certain steps needed for him to take in order to qualify for employment, how is that not part of a cost of maintenance? And why should my client ever incur that cost? Didn't your client, does the record show you that the client spent $3,000 and some dollars on vinyl cutting and sign making equipment? It does, it does. And certainly what happened in that situation, did he request reimbursement from the insurance company? Yes. Did he get it? No. It was only after it was ordered by the commission. I think it's a fact that he learned, and it's certainly in his mind as he's dealing with a PERC card, whether he should go out and expend the kind of expenditure. But even taking a step back for a second. Which came first, the refusal to get the PERC card or the spending of the money on the graphics equipment? Well, take a step back for a second. Which came first? You know, I couldn't honestly answer that question. I think he was applying for these jobs for four years over the four-year period before he went out and spent all the money on the graphics equipment. I know that right from the get-go he was talking to them about graphic arts design, different programs at Moraine Valley. He had submitted into the insurance company the cost of those programs after it would be authorized and was told that it's not happening. But taking a step back for a second, with respect to this PERC card issue, the question I would have is, has there ever been a single job that was identified as you would have had that job but for the fact that you didn't get the PERC card? Did the insurance company ever call him up and say, you know what, you have to attend this interview and you have to get this PERC card? Was there any testimony to that fact? So aren't we kind of just chasing our tail in a situation like this? Where's the job at? Where's the loss that occurred? The fact of the matter is, I have a client who submitted, who went through 2,400 job leads. Job leads prepared both by himself as well as the insurance company. These are the rules that have been established. If you have permit restrictions and you can't go back to your job because your employer can't take you back, they put you in maintenance. They put you in a vocational rehabilitation program. And you're supposed to cooperate with them. And he did. He did. Their vocational counselor said in his closing report that he had been complying, he'd done everything that had been asked. So he went by the rules that have been established. He did the diligent job search that the appellate court has set out as the standard. He did it for four years and seven months. You can talk about the economy, but the brilliance of earlier cases talking about outlawed permanent and total disability is you don't put a bright line test on. You don't say you have to search for a job for nine months or 12 months. It allows flexibility for each and every standard, for each and every situation. Four years and seven months, I think, is sufficient. It's definitely sufficient. I think the commission's decision is baffling at times because they did fault him for going out and looking for a graphic arts position. They faulted him for wanting to get a job. They said that's evidence of the fact that he's not unemployable. How does that logic ever follow? I think they said even he thinks he's not unemployable because he went to get a job out in the graphic charts industry. Okay. So I'll accept that premise. I think that's exactly the mindset that anybody who gets into a vocational rehabilitation position should be. I guarantee you every outlawed case that would deal with something like this, that petitioner had better be saying, I think I can get a job. Because sure as shooting, if he said, I'm going to do this, but there's no way I'm getting a job, the insurance company wouldn't hesitate to cut my client off, would they? And certainly the courts would agree with a position like that. I don't think I would argue that. The commission said the reasons why they denied him odd lot permanent was because Belmonte said he was prospectively employable. He chose not to get a PERC card, so he couldn't apply for security positions, couldn't get them. And he chose not to apply within the auto industry. And those branches of the leg of the market were all available to him. And so they turned around and said, this man is not an odd lot permanent. And it's a factual determination. In the face of that evidence, you really think it's against the manifest way? Absolutely. Because the commission cites the auto industry, and they said my client never applied for a job in the auto industry.  We know that's not true. Taylor made my client's resume to highlight his experience in the auto industry. And they actually have in the reports that he was getting some feedback based upon that. So that is simply... Where is the evidence that he actually applied in the auto industry? It's in the course of the record itself and in my brief, Your Honor. I knew that it was painful, but I laid it all out. I went through each position and cited to the positions. It's on page 11 and 12 of my brief with the citations to each of the positions. Whether it's a detailer, a automotive electronic, electronic repair, automotive estimators, it's the full branch of jobs. It's all in there. So that's one of the factors. Sorry about that. So he certainly applied to the automotive industry. I think at the end of the day, what the court has laid out is you have to be able to show that you've conducted a diligent job search. And in this case, my client worked for four years and seven months conducting a diligent job search. And based upon that, I would submit that he has shown himself to be an odd lot in permanent total disability. Thank you. Thank you, counsel. Counsel may respond. Good morning. May it please the court, counsel. My name is Steve Costello, and I'm here on behalf of Certified Installations. And I'm here to argue that the Illinois Workers' Compensation Commission did not err when it awarded the plaintiff 50 percent loss of use, man as a whole, instead of an odd lot permanent total award. The plaintiff is here to argue that his client was rendered an odd lot permanent total. And as you know, a prima facie case of odd lot can be showed by either a diligent but unsuccessful job search or that because of the – Counsel, we understand the law, and you understand what we're having difficulty with. So let's get to the facts, please. Okay. Counsel wants to argue the fact that his client searched with the help of vocational counselors for four years and seven months, and that in and of itself proves that he can never find another job. I don't think we would be here today if, in the beginning, when he was released by his functional capacity evaluation, if he had actually contacted his union and was honest in advising them, hey, I'm released now, do you have work within a heavy-duty work release? I can work up to 58 pounds. When I asked him on cross-examination, did you contact your union, his response was, yeah, I called someone, I spoke with the receptionist, and I said, oh, I'm released to light duty. Do you have anything? No? Okay, goodbye. Right then and there, I can't force someone to be honest or follow through with their union. So then we start the vocational rehabilitation process. Counsel has mentioned that his client sent out 2,400 job applications to try to find another job. In the case of Alexander v. Industrial Commission, the district court here mentioned that it's basically quality instead of quantity. In that case, over 500 job applications were sent out within one year, and you still affirmed the decision awarding that plaintiff 50 percent loss of use man as a whole. Counsel? May I interrupt you just for a moment? Before you go past that point where you were asserting that he should have contacted the union, it's indicated in the reply brief that the vocational counselor indicated that he, the vocational counselor, would contact the union to inquire about possible modified positions that he would be able to do. So wouldn't that be adequate? That, but I think when you're looking for a job, the best person to find yourself a job is you. And if you're contacting the union and are not being truthful or following up, it's better that he as a union card-carrying member contact the union and follow through with that. Might be better, might be a more direct path. But was the evidence such that the claimant was aware that the vocational counselor was going to be making that contact? I do not recall. All I do recall is that he did testify that he himself contacted a receptionist at the union. He also goes on to state in the reply brief that one of the vocational counselors told him, you might as well not keep your union card, you can't go back to work. Is that accurate in terms of what the testimony was? There was no testimony on the part of any vocational counselor. I did enter into evidence all the vocational records, and I can't specifically remember which record contained that information. Counsel also mentions the fact that he did apply for different automotive work positions. When I went through his reply brief, I counted up those positions, and dividing by the 2400, he basically applied for, I think it was like 1.25 percent of his job search entailed looking for auto body work. You're talking about a man who was working 22 years in the union as a pipe, not a pipe fitter, but a tile fitter, and before that had 12 years of experience in like the auto body field. So I think he was lax in his attempts to find auto body positions when only less than 2 percent of his 2400 attempts were focused on the auto body field. Let me ask you this. You acknowledge a four-year period of time is a pretty long period of time, is it not? Four years and seven, or a pretty long period of time for, since he worked in the auto body. No, because it's job search that he was going through, okay? For four years he looked. 2400, did you say 2400 applications? That's his allegation. Well, do you dispute that? No, I take him by his word. That seems like a pretty exhaustive. So you're saying that notwithstanding that, to sort of paraphrase an expression, he was looking for jobs in all the wrong places? What's, what do you make of this? You can take 2400 applications and throw them out on the sales street, but that does not, and you can call that a job search. But if you're not looking for areas in where you have, you know, prior job experience, you're being honest in your job search, you're cleaning yourself up so that when you do apply for a bank position or some entry-level position, you don't scare away potential employers? Well, that's a delicate issue. We are supposedly living in the age of enlightenment. So how subjectively, how do you know that the appearance precluded him from getting these jobs definitively? How do we know this? You don't know, and I think that issue of appearance came up when we were talking about did he really comply with vocational rehabilitation. And when you look at many of the, especially the early notes, there's issues where, you know, claimant does not feel that he can go back to the tile setting where claimant, you know, appears disheveled, and claimant has been advised that he should clean himself up, or when he presents himself in an interview behave in this manner or that manner to help increase his odds of getting a job. And so as far as, like, the appearance goes, I think that was one of many issues that some of the vocational counselors had with the plaintiff. It wasn't just, you know, the only reason why he couldn't find another job. When you also look at the fact that the restriction in and of itself is 58 pounds, to his left hand, his left arm, he sustained an injury which required 17 stitches. This is not someone like in the Alexander case who had multiple knee surgeries, had a 25-pound lifting restriction, who was in a much worse off state physically. All right. So tell us succinctly what evidence is there in summary form in the record to support the commission's decision? Pointing at your main points. The main points to support the commission's decision is the fact that he was someone that was returned to work with a 58-pound lifting restriction. He failed to cooperate the best that he could with regard to finding a job when he was working with rehab counselors. He wasn't abiding by their recommendations for appearance, attempts to get a perk card, attempts to search for jobs in his field prior to the union tilesetter position. Those factors and the fact that in the beginning he did not, in my opinion, do a good enough search to try to get back into a union. He has not, during his time off, spent any time volunteering to try to get a position, trying to break out into other areas, other avenues of employment. He's someone with, he's not so detrimentally affected by this accident that he could not find gainful employment. And it's easy for someone to sit down and work with counselors for four years and seven months and say, you know, let them find me a job. You know, the onus is on them. I'm going to sit back now and I'll go out and do what I want to do. And there were different comments in the vocational reports where he's like, I don't feel I can go back to the tilesetter position. I don't feel like I can do that. I can't hold the, I forget the tool he's talking about. I can't do that. So it's like self-limiting. Yet you find in the record that he was interested in graphic arts design and he did spend $3,500 of his own money to try to get into that. So he's not so affected by this injury to where he cannot go back, you know, to work. He's not so downtrodden as a result. I think all of those factors basically argue that the arbitrator, the commission, the circuit court were all right in awarding 50% loss of use man as a whole and not an odd, loud permanent total. And, Your Honors, that's all I have if you have any questions. I don't believe there are. Thank you, Counselor. Thank you. Counselor, you may reply. Thank you. In my reply brief, I do cite to the reports of the vocational counselors hired by the insurance company for their comments. And I noted that on 360 of the record, he was cooperative and professional in his dress and approach to potential employers. On 368, he presents himself in a professional and positive manner. Secondly, I know Counselor talked about the fact that you could take resumes and throw them out on the South Street and say you, you know, conducted a job search. That's not what happened here, okay? They complied with the law. They hired professional vocational people to work with my client. That's their job. That's the requirements under the Act. And my client complied with them. He did what he's supposed to do. And he did it for four years and seven months to the tune of 2,400 contacts. You want to know where they're at? They're in here, each and every one of them. What did Belmonte say, your own counselor? What did he say about it? Absolutely. So, remember now, he submitted two reports. Perspectively employable were the words Mr. Belmonte used. And he considered him a viable vocation rehabilitation candidate. Absolutely. Now, Justice, remember, there's two reports. And what I would submit to you is if I met with a vocational counselor on day one, it would not be illogical for that vocational counselor to say that. And year after year one, it would not be illogical for that counselor to say that. Okay? I'm not here to argue that at a certain point in the process my client wasn't employable. If he wasn't employable, then why would we be doing any of this? The fact of the matter is, though, what the courts have said is at some point after a failed and diligent job search that he would become an odd lot permanent total disability. He could become. They could find based on a failed job search, but they didn't. They found evidently this guy didn't do enough. Or in the alternative, he refused to accept jobs within an industry or refused to get what he needed to get jobs within an industry that was available to him. And a $200 fee he wouldn't pay, and therefore he couldn't apply for a single security job. Couldn't I make the same argument about a multimillion-dollar insurance company? Well, how about a guy that spends how much money on graphic design equipment? Again, couldn't I make the same argument about a multimillion-dollar insurance company? I asked you a question. You don't ask me a question. But I'm just saying that same type of logic could apply in this situation. So my question is, could they adopt it in this case? And if so, if not, why not? What I would submit is that there's still nobody who has shown that there was a job in the security industry for him. It was a first step. It was a first step. That's all. Nobody showed that there was actually a security job. Nobody brought somebody in and had somebody testify that said, you know, this guy, wow, what a credentials he's got. He would make just a fantastic body-finding security guard. The Court of August the 20th, 2010, said that the claimant was potentially employable as a cashier, floor waxer, security guard, and ticket taker. None of which ever he never had a job interview for any of those positions? He couldn't apply for a security job. Didn't he have a certificate? I'm simply saying that all those positions that you listed, not one of them has he ever offered a job interview, never once has he offered a job position. And the one point I do wish to make about Mr. Belmonte, again, he submits two separate reports. The first report, he says there's still a possibility for this guy. But you know what they've got to do? They've got to help him out. They've got to give him what's required under the Act. They can't just send him out there. He's floundering. What did he need in order to qualify as a security guard? What did he need? What training did he need? Well, he would need a FOID card. Yes, he would. He would need a PERT card. Yes. He would need a high school diploma. He had a high school diploma. Right. Yes, correct. So for not paying $200, he can't get a job. And therefore, he becomes an on-lot permanent. Is that the logic? I'm submitting to you, again, nobody has stepped up and said, here's the job. He had a job. He had a job as a security officer. There is no testimony to that. Hold on a second. He's first got to introduce evidence that he couldn't get a job as a security officer after they said he's capable. I don't think he has to submit. They said he's capable. Your own guy says he's potentially employable, or their guy says potentially employable as a security guard. So now we've got potential employability within the security industry. He won't pay the money for the PERT card, so he can't get a job within the security industry. And you come in and say, aha, he has no job, so he's an on-lot permanent. I would submit that a security job is not the only position out there. And it's not like they tailor-made and said, you know what, we can only search within the security industry to try and find employment. Okay, Counselor, your time is up. Thank you, Counselor, for your arguments. The Senator will be taking your advisement. This is an issue. The Court will stand in brief recess.